IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ISMAEL TAMAYO-BAEZ,<br><br>Defendant. | No. CR14-3055<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

*I.*   *INTRODUCTION* .................................. 1

*II.*  *PROCEDURAL HISTORY* ............................ 2

*III.* *RELEVANT FACTS* ................................ 2

*IV.*  *DISCUSSION* .................................... 5
       *A.*  *Vehicle Stop* ............................. 5
       *B.*  *Roadside Questioning* ..................... 7
       *C.*  *Fruits of the Illegal Seizure and Unlawful Interrogation* ......... 9
       *D.*  *Summary* ................................. 12

*V.*   *RECOMMENDATION* ............................... 12

## I. INTRODUCTION

On the 17th day of December 2014, this matter came on for hearing on the Motion to Suppress (docket number 16) filed by the Defendant on December 3, 2014. The Government was represented by Assistant United States Attorney Daniel C. Tvedt. Defendant Ismael Tamayo-Baez appeared in person and was represented by his attorney, Rockne Cole.

## II. PROCEDURAL HISTORY

On October 30, 2014, Defendant Ismael Tamayo-Baez was charged by Indictment with illegal reentry into the United States. Defendant appeared on November 4 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on January 5, 2015.

On December 3, 2014, Defendant timely filed the instant motion to suppress. The Government filed its resistance on December 12. Because of the pending motion to suppress, the trial was continued to February 17.

## III. RELEVANT FACTS

Kevin Taylor, an immigration enforcement agent with Immigration and Customs Enforcement ("ICE"), testified that earlier this year ICE conducted an investigation into the fraudulent use of social security numbers. ICE investigators went to a work site looking for an individual using a fraudulent social security number (not Defendant), and took down the numbers of vehicle license plates. According to Taylor, the plate numbers did not match the person who investigators believed was working at the business. When investigators checked the license plate numbers, they were able to obtain the names and addresses of the registered owners.

A 1997 Jeep Cherokee seen at the work site was registered to Andrea Tamayo at a residence on 5th Street in Hampton, Iowa. Investigators checked the address through "CLEAR," and Defendant's name came back associated with that address.[1] Further investigation revealed Defendant had been removed from the United States in March 2004. Nonetheless, a check of his criminal history showed he was convicted of domestic abuse assault second offense in 2009 — *after* he was deported. A check of "social media" also revealed a photograph of Defendant standing in front of a black Jeep Cherokee. There are

---

[1] Agent Taylor testified that it is his understanding Andrea Tamayo is Ismael Tamayo-Baez's wife.

no records indicating Defendant obtained official permission to return to the United States. These record checks were made on October 3, 2014. Based on this information, it was believed Defendant had returned to the United States illegally. A decision was made to travel to Hampton to locate Defendant and arrest him for unlawfully re-entering the United States.[2]

On October 23, 2014, Agent Taylor left Des Moines in the early morning hours and arrived at Defendant's residence at 4:50 a.m. It had been raining that morning and Taylor noticed there was a "dry spot" on the pavement, indicating a vehicle had just left. Eventually, Taylor saw "someone matching [Defendant's] description leave his home" and walk to the garage. The person then left the property driving a black Jeep Cherokee. Taylor followed the vehicle, although he admitted he "did not 100 percent know who was in the vehicle."

Agent Taylor observed the Jeep stop to pick up a passenger and then start to head out of town. Taylor and another officer conducted a traffic stop at approximately 5:50 a.m. Taylor activated the emergency lights and siren on his vehicle and the driver of the Jeep promptly pulled over. Taylor walked up to the driver's side of the vehicle and asked the driver for his name. Defendant identified himself as Ismael Tamayo or Ismael Tamayo-Baez. Defendant also responded to questions regarding his date of birth, country of birth, and country of citizenship. In response to questioning by Taylor, Defendant admitted he did not have any "papers" and was in the country illegally. At that point, Taylor told Defendant to get out of the car and he was placed under arrest. The passenger was released.

---

[2] If there is probable cause to believe an alien is illegally in the United States, then he is subject to a warrantless administrative arrest. *United States v. Quintana*, 623 F.3d 1237, 1239-40 (8th Cir. 2010).

3

At some point, Agent Taylor obtained a Mexican consular ID from Defendant. Taylor could not recall, however, whether Defendant handed it to him when Taylor was alongside the vehicle, or if Taylor retrieved it from Defendant's wallet when he was putting Defendant in the back of the patrol car. Defendant was apparently searched incident to arrest before being placed in the patrol car.

Defendant was initially taken to the Franklin County Sheriff's Office where his fingerprints were taken to confirm his identity. Agent Taylor could not recall any statements made by Defendant while en route to the sheriff's office, and could not recall whether Defendant was interviewed while at the sheriff's office. After confirming Defendant's fingerprints were related to the earlier removal order, Taylor then drove Defendant to the ICE office in Des Moines for further processing. Taylor could not recall that Defendant made any statements en route to Des Moines.

After arriving in Des Moines, Agent Taylor asked Defendant additional "biographical information," including his address, the name of his spouse, whether he had any children, and his parents' names. Taylor testified that because Defendant was potentially facing a federal criminal charge of illegal reentry, he read Defendant a *Miranda* warning "shortly after" asking the biographical questions.

Agent Taylor was asked on cross-examination whether he questioned Defendant about his removal from the United States. Initially, Taylor testified he "may have" asked that question while obtaining the biographical information, although "I had already known the answer because his fingerprints had come back as a match to someone who had previously been removed from the country." Taylor then testified that he did not recall, without looking at the "interview sheet," if he asked Defendant about his removal during the processing in Des Moines because "sometimes I do not ask that question."

The *Miranda* warning given to Defendant is found on a written "record of sworn statement" introduced at the hearing as Plaintiff's Exhibit 1. The warning is in English

and in Spanish. Agent Taylor testified that the warning would have been read to Defendant, although it's unclear whether it was read in English or Spanish. Taylor testified that Defendant "appeared to have marked that he understood his rights in both; he marked yes for English and si for Spanish."[3] Taylor testified he could not recall any statements made by Defendant following the *Miranda* warning, other than the written statements found on Exhibit 1. Defendant's written answers state his name, his date of birth, that he was born in Mexico, the first names of his parents and that they were citizens of Mexico, and that he was deported from Iowa. When asked "did you illegally enter the United States," Defendant responded "no."

## IV. DISCUSSION

In his motion to suppress, Defendant raises three issues: First, Defendant asserts he was seized without probable cause. Second, Defendant argues that statements made during the traffic stop must be suppressed because he was not given a *Miranda* warning. Third, Defendant argues that all of the evidence is fruit of the illegal seizure and unlawful interrogation and, therefore, must be suppressed.

### A. Vehicle Stop

Defendant first argues that the vehicle stop lacked probable cause and violated the Fourth Amendment. The law regarding vehicle stops is well-established. "A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause." *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008). If probable cause is lacking, an investigative stop still does not violate the Fourth Amendment "if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *United States v. Bell*, 183 F.3d 746, 749

---

[3] When asked at the end of the warning "do you understand your rights," Defendant circled "yes" and appears to have crossed over "si." He then put his initials in both places.

(8th Cir. 1999). "If reasonable suspicion exists, officers may briefly detain a vehicle and its occupants to conduct a reasonable investigation." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012).

In his brief, Defendant's analysis on this issue is confined to a single paragraph:

> Here, discovery only reveals that Mr. Tamayo was seized due to a "targeted vehicle stop." No information was provided as to why they thought Mr. Tamayo was in the country illegally, or as to [how] ICE officials knew he had reentered. That is not enough to support a stop.

Defendant's Brief (docket number 16-1) at 3. That is, Defendant argues that "discovery" does not support a finding of probable cause. I do not know what is contained in the Government's discovery file, but in determining whether there was probable cause or reasonable suspicion to stop the vehicle, the Court is not so constrained. Rather, it must consider the circumstances known to the officer at the time of the stop.

Agent Taylor's testimony at the hearing explained why Defendant's vehicle was "targeted" on October 23. As set forth above, ICE investigators ran the license plate during an investigation into the fraudulent use of social security numbers. Further checking revealed Defendant was associated with the registered owner of the vehicle, had been removed from the United States in 2004, but was subsequently convicted of a crime in Iowa in 2009. Investigators also discovered a photograph showing Defendant standing in front of a black Jeep Cherokee, which matched the description of the vehicle seen at the work site. There are no records indicating Defendant obtained official permission to return to the United States. Accordingly, there was probable cause on October 23, 2014 to believe Defendant had illegally re-entered the United States.

On October 23, Agent Taylor staked out Defendant's residence and saw someone matching Defendant's description leave the home and walk to the garage. The person then drove off in a black Jeep Cherokee. "Reasonable suspicion is not a "finely-tuned" or bright-line standard; each case involving a determination of reasonable suspicion must be

decided on its own facts." *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002). I believe there was "reasonable suspicion" to believe that Defendant was driving the vehicle and that he was "involved in criminal activity" — *i.e.*, unlawful reentry into the United States. *Bell*, 183 F.3d at 749. Accordingly, Taylor was authorized to stop the vehicle to conduct an investigation. *Zamora-Lopez*, 685 F.3d at 790. There was no Constitutional violation.

## B. Roadside Questioning

Next, Defendant argues that his roadside statements to Agent Taylor should be suppressed because he was not given a *Miranda* warning. According to Defendant's brief, "[h]ere, the fighting issue is custody."[4] The only case cited by Defendant in support of his argument is *Berkemer v. McCarty*, 468 U.S. 420 (1984). In *Berkemer*, the Court considered "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation.'" *Id.* at 435. The Court concluded that "the usual traffic stop is more analogous to a so-called '*Terry* stop,' than to a formal arrest." *Id.* at 439. The Court declined to adopt a black-letter rule exempting traffic stops from the *Miranda* requirements or, conversely, requiring a *Miranda* warning in all traffic stops.

> Either a rule that *Miranda* applies to all traffic stops or a rule that a suspect need not be advised of his rights until he is formally placed under arrest would provide a clearer, more easily administered line. However, each of these two alternatives has drawbacks that make it unacceptable.

*Berkemer*, 468 U.S. at 441. Instead, the Court must consider whether the circumstances can "fairly be characterized as the functional equivalent of formal arrest." *Id.* at 442. *See also United States v. Rodriguez*, 711 F.3d 928, 935 (8th Cir. 2013).

---

[4] Defendant's Brief (docket number 16-1) at 4.

Here, Agent Taylor activated his emergency lights and siren to pull over Defendant's vehicle. Taylor then approached the vehicle and asked the driver questions to confirm his "reasonable suspicion" that the driver was Defendant, who Taylor believed had returned to the United States illegally. Because he had information suggesting Defendant had returned to this country illegally, Taylor was permitted to inquire about Defendant's immigration status. *United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (8th Cir. 2003). Taylor testified that he asked Defendant his name, date of birth, country of birth, and country of citizenship.[5] In response to questioning by Taylor, Defendant admitted he did not have any "papers" and was in the country illegally. At that point, Taylor directed Defendant to get out of the car and he was placed under arrest. The initial questioning, a variation of which is undoubtedly conducted by officers thousands of times every day in traffic stops all over the country, cannot be fairly characterized as "the functional equivalent of formal arrest." The fact that "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so," does not convert a traffic stop into "the functional equivalent of formal arrest," thereby triggering the need for a *Miranda* warning prior to questioning. *Berkemer*, 468 U.S. at 436-37. Accordingly, I believe Defendant was not "in custody" until he stepped out of the car and was formally arrested.

Because Defendant was not "in custody" while responding to Agent Taylor's roadside questions, no *Miranda* warning was required and the statements made prior to his formal arrest are admissible against him. *Id.* at 442. Because Defendant was not given a *Miranda* warning following his formal arrest, statements made in response to questioning after that time would generally be inadmissible. In this case, however, Taylor apparently did not interrogate Defendant further, and he could not recall any statements made by

---

[5] Apparently, the encounter was not recorded.

Defendant en route to the sheriff's office, while at the sheriff's office, or en route to Des Moines.

Defendant's motion to suppress and supporting brief are directed solely at statements made by Defendant during the roadside stop. That is, Defendant does not directly challenge the questioning conducted by Agent Taylor after they arrived at the ICE office in Des Moines, nor does he cite any authority on that issue. The interview in Des Moines was also apparently not recorded and, as a practical matter, Taylor appears to have only a vague recollection of the discussion. At the hearing, Taylor testified regarding an "interview sheet," but it is unknown to the Court what information may be contained on that document. After being asked certain "biographical information," Defendant was given a *Miranda* warning. Again, however, Taylor could not recall any statements made by Defendant following the *Miranda* warning, other than the written statements found on Exhibit 1.

### C. Fruits of the Illegal Seizure and Unlawful Interrogation

Finally, Defendant argues that "assuming Defendant succeeds" on the first two issues, the Government is unable establish an "independent basis" for its investigation and, therefore, "all evidence" arising from the traffic stop, statements made by Defendant, and fingerprints must be suppressed. As set forth above, I believe the first two arguments asserted by Defendant are meritless. Agent Taylor had a reasonable suspicion that the driver of the black Jeep Cherokee had re-entered the country illegally. Accordingly, he was authorized to stop the vehicle to investigate. Because Defendant was not arrested until Taylor confirmed his identity and his unlawful status, and because the initial traffic stop cannot be fairly characterized as the functional equivalent of formal arrest, Defendant was not in custody and a *Miranda* warning was not required. Accordingly, I believe the Court may summarily reject Defendant's third argument.

Even *if* the Court concluded that Defendant's vehicle was unlawfully stopped, his statements were made in violation of *Miranda*, and all of the evidence regarding the events of October 23, 2014 must be suppressed, it is difficult to see how that would prevent Defendant's prosecution for illegally re-entering the United States. The cases cited by Defendant in his brief set forth well-established black letter law, but have no direct application to the facts presented here. In *Weeks v. United States*, 232 U.S. 383 (1914), decided more than 100 years ago, the Court created the exclusionary rule as a remedy for violations of the Fourth Amendment. In *Silverman v. United States*, 365 U.S. 504 (1961), the Court concluded that the Fourth Amendment prohibited the use of evidence obtained by placing a listening device in a house without a warrant. In *Murray v. United States*, 487 U.S. 533 (1988), the Court considered circumstances where knowledge of contraband was acquired at the time of an unlawful entry into a building, but then reacquired during a subsequent search conducted pursuant to a warrant. Frankly, these cases are of little use to the Court in analyzing the circumstances presented in the instant action.

Defendant is not charged with a single criminal act which occurred on October 23, 2014. Accordingly, even *if* the Government is precluded from offering any evidence regarding the events of that date, it is difficult to see how Defendant would be immune from prosecution for illegal reentry into the United States. At the time of hearing, Defendant's counsel seemed to concede the point, but argued that "if you throw out all of the evidence arising from the illegal stop, it's a much weaker case for the Government and so we'll cross that bridge when we get there."

The Court's comments in *United States v. Flores-Sandoval*, 422 F.3d 711 (8th Cir. 2005), are instructive. In that case, the defendant was arrested on unrelated charges. Because the defendant spoke primarily Spanish, local law enforcement officers called an agent of the United States Border Patrol to act as an interpreter during questioning. Despite the fact that it was a "custodial encounter," the defendant was not given a *Miranda*

warning. Defendant admitted he was in the country illegally and was administratively detained by the border patrol. The next day, while still in custody, the defendant's fingerprints were taken and it was confirmed the defendant had previously been deported as an alien. The defendant was then *Mirandized* and admitted he had been previously deported. He was then charged with illegally reentry into the United States. The defendant moved to suppress the evidence, arguing that his initial detention by local law enforcement officers was unlawful and, therefore, any evidence obtained as a result of that detention was tainted. The district court agreed and the Court of Appeals confirmed. Nonetheless, the Court of Appeals noted that its decision would have little practical effect on a prosecution of the defendant for illegal reentry.

> Following the disposition of this appeal, ICE may issue a detainer to retake custody of Flores-Sandoval because, as a jurisdictional rather than an evidentiary matter, his body and identity cannot be suppressed as fruit of the poisonous tree. (citation omitted) ICE will likely obtain a new set of fingerprints from Flores-Sandoval for civil deportation proceedings, and the government may recharge him with illegal re-entry after deportation. As a practical matter, our decision is of very limited value to Flores-Sandoval. The decision simply applies well-established Supreme Court and Eighth Circuit precedent and admittedly reaches a result that has a somewhat academic feel to it. Yet we believe there is value in reminding the government that it must do things "the right way." Our holding today serves that important interest.

*Flores-Sandoval*, 422 F.3d at 715.[6]

---

[6] Following the Eighth Circuit's opinion, the indictment against Flores-Sandoval was dismissed and he was re-indicted for the same offense one week later. The defendant's subsequent conviction was affirmed on appeal. *See United States v. Flores-Sandoval*, 474 F.3d 1142 (8th Cir. 2007).

### D. Summary

Aside from the limited practical effect of Defendant's motion to suppress, I believe the motion is without merit. Agent Taylor had probable cause to believe Defendant had reentered the country illegally. Furthermore, he had reasonable suspicion to believe Defendant was driving the black Jeep Cherokee which he pulled over on October 23, 2014. To confirm his suspicions, Taylor asked Defendant questions regarding his identity and legal status. Because Defendant was not in custody at that time, Taylor was not required to give Defendant a *Miranda* warning prior to questioning. There was no Constitutional violation.

### V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 16) filed by the Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on December 17, 2014.*

DATED this 24th day of December, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA